Ben H. STORM, Petitioner,

v.

TAYSTEE BREAD COMPANY, Zurich General Accident and Liability Insurance Company and the State Industrial Commission of the State of Oklahoma, Respondents.

No. 36787.

Supreme Court of Oklahoma.

Feb. 14, 1956.

Rehearing Denied June 5, 1956.

Application for Leave to File Second Petition for Rehearing Denied Sept. 25, 1956.

Pierce, Pierce & Brook, Muskogee, B. H. Carey, Oklahoma City, Charles R. Nesbitt, Oklahoma City, of counsel, for petitioner.

Banker & Bonds, Muskogee, Mac Q. Williamson, Atty. Gen., for respondents.

HALLEY, Justice.

On the 5th day of February, 1953, Ben. H. Storm, hereinafter called claimant, filed his first notice of injury and claim for compensation stating that while employed by Taystee Bread Company, employer, he sustained an accidental injury arising out of and in the course of his employment on the 15th day of May, 1951. The trial commissioner denied an award and the order denying the award was affirmed by the Commission en banc. This proceeding is brought by the claimant to review the order denying an award.

The record discloses that claimant was a mechanic who repaired trucks for his employer; that claimant suffered a heart attack May 15, 1951, while on a trip to Tulsa at the direction of the employer to investigate the purchase of trailers. He was taken to the home of a daughter in Tulsa and from there to a Tulsa hospital where he remained for 27 days. He left the hospital approximately June 15th, and went to the daughter's home where he stayed until July 3rd. He returned to his home in Muskogee where he stayed until he had recovered sufficiently to return to work and returned to the plant approximately the last day of September, 1951. He remained at work and was paid his full salary until November 1, 1952, when he was discharged. He was paid his regular weekly wages to and including December 8, 1952, on the date of his discharge. In April, 1952, he suffered a further heart attack and was hospitalized for 36 hours and returned to work. When he returned to work in September, 1951, he did not resume his regular work except for a period of approximately 30 days. He was unable to perform the work formerly done by him and assisted in training two young men, one of whom assumed his duties as a mechanic. Claimant had sustained a head injury in April, 1951, and listed this in his original claim but at the time of the amendment to his claim his counsel stated that he had completely recovered from the head injury and relied only on the accidental injury of May 15, 1951.

The employer carried group insurance for sick benefits in addition to workmen's compensation insurance and claimant was paid $35 per week out of the benefits provided by this group insurance and the employer paid the balance of his weekly salary. This continued during the disability of claimant while the group policy was in force and until it expired. Thereafter claimant was paid his full salary by the employer until the date of discharge, which was as above stated, December 8, 1952.

Claimant first argues that these payments were made with full knowledge of the accidental injury of May 15, 1951, and that therefore claimant had one year from November 1, 1952, in which to file the claim.

The State Industrial Commission found that claimant sustained an accidental injury by reason of which he is now totally and permanently disabled and then found:

"During all of the period of the claimant's disability, from the date of the accident to December 8, 1952, he received a full amount of his wages. For a portion of this time the claimant received benefits under a Health and Accident Policy, and during this period the respondent supplemented the benefits sufficiently to make up the full amount of wages. During the rest of the time the respondent paid the full wages. But until the filing of his claim for Workmen's Compensation on February 5, 1953, the respondent had not been advised by the claimant and did not know of the accidental injury of May 15, 1951, and although the failure of the claimant to give the Statutory 30 days' written notice did not otherwise prejudice the respondent and should be excused, as hereinabove found, the failure to notify the respondent of the accidental injury precluded the respondent from making a choice between the payment of wages in lieu of compensation or leaving the claimant to his legal remedy. Consequently, it is specifically found that the wages paid by the respondent to the claimant dur-

**666**

ing the period from the date of the accident to December 8, 1952, were not paid as a substitute for payments due the claimant under the Workmen's Compensation Law [85 O.S.1951 § 1 et seq.]."

Claimant testified that he got to the Wynn Trailer Yard, where he intended to purchase the trailers, at about 9:30 and worked for about an hour pulling heavy trailers to determine whether they would properly fasten on his truck. He then sat down on the end of a trailer and was talking to Mr. Wynn. In about 20 minutes he suffered the heart attack. He drove his own car to the home of his daughter. The daughter called the manager of the employer and informed him that her father had suffered a heart attack; that thereafter, about 21 days after he entered the hospital, the manager visited him and told him that he had nothing to worry about, that his wages would be paid until he was able to return to work; that frequently the manager informed claimant that he had nothing to worry about. No claim was ever filed by claimant prior to the filing of the claim on the 5th day of February, 1953, and the State Industrial Commission found that the payments were made without knowledge of any accidental injury.

In Sinclair Prairie Oil Co. v. Stevens, 194 Okl. 109, 148 P.2d 176, 181, it is stated:

"The point is that the payment of the money allowance must have been for disability arising from accidental personal injury, as in this case distinguished from disability arising from sickness. It is the real purpose of the payment as distinquished from the name given it which controls. On this point the knowledge (actual or imputed) and the intent (proven or inferable) of the employer are important factors."

It was also stated therein:

"Thus when there is conflicting evidence or different inferences can be drawn from the evidence, the question of whether the payments called 'wages' or 'sick benefits' were in reality payments of 'compensation or remuneration paid in lieu of compensation' becomes one of fact. The finding of the commission on the point should be approved in this court if the record reflects evidence reasonably tending to support it. * * *"

The employer offered testimony to support the finding that the payments were made as sick benefits and that the employer did not know the heart attack arose out of and in the course of his employment. There is evidence in the record from which the State Industrial Commission was authorized to find that neither the manager nor claimant knew what caused the heart attack and there is other evidence supporting the finding of the State Industrial Commission as above set out. In Bassett v. Magnolia Petroleum Co., 190 Okl. 480, 124 P.2d 984, it is stated:

"The question, whether payments made to an injured employee, subsequent to the injury, are made as wages or compensation, under the Compensation Act, is, as a general rule, one to be determined by the Industrial Commission; and this court will not disturb its finding thereon, on petition to review, where there is any competent evidence reasonably tending to sustain the same."

Claimant also argues that by its conduct the employer is estopped to deny that the payments were made in lieu of compensation and cites in support thereof Consolidated Gas Utilities Co. v. Thomason, 167 Okl. 81, 26 P.2d 923; Logan County v. York, Okl., 270 P.2d 968 and related cases.

The finding of the State Industrial Commission that the employer did not know that claimant had sustained an accidental injury arising out of and in the course of his employment is sustained by the evidence. In such event it could not be held that the above cases are applicable. We approve the finding by the State Industrial Commission. There was no error in denying the award.

Order sustained.

JOHNSON, C. J., and CORN, JACKSON and HUNT, JJ., concur.

WILLIAMS, V. C. J., and BLACKBIRD, J., dissent.

WILLIAMS, Vice Chief Justice (dissenting).

For the reason that I am unable to agree with the majority approval of the interpretation by the Industrial Commission of certain evidence referred to in the order of the trial commissioner denying an award, I dissent to the opinion of the majority.

The opinion, in the main, correctly sets forth the factual situation upon which it is based. However, in quotation from the trial commissioner's order approved by the commission en banc, it is stated "but until the filing of his claim for Workmen's Compensation on February 5, 1953, the respondent had not been advised by the claimant and did not know of the accidental injury of May 15th, 1951 * * *."

The point of contention in this case appears to be whether the employer or its manager was notified by the claimant that his heart attack occurred while the claimant was at the Wynn Trailer Yard. The employer's route manager and office manager, both of whom worked under the plant manager and were fellow employees of the claimant, testified respectively that claimant "got sick at his daughter's" and "on his daughter's front porch * * * it was the first he knew about his heart trouble". Claimant, however, did not make such statement and the trial commissioner settled that issue in his order, wherein he found as follows, to-wit:

"1. On May 15, 1951, while inspecting trailers manufactured by Row C. Wynn, at Tulsa, Oklahoma, with a view to the purchase of one or more of such trailers by the respondent, the claimant was subjected to unusual physical strain and exertion in raising the tongues, 600 and 800 lbs. trailers to 'coupling' level, lifts of from 50 to 75 lbs, and pushing such trailers about the premises of the manufacturer, for the purpose of testing their suitability for use by the respondent, and by reason thereof precipitated a myocardial infraction, or acute heart attack, which resulted in total permanent disability."

Employer's manager, who had left the company in July, 1952, testified on behalf of claimant that he sent claimant on the date in question to Tulsa on company business, that claimant was on the pay roll of the company at the time and was paid for that day's work "like any other day". In response to questions asked him, he then testified:

"Q. Now, do you recall having advised that information about him having a heart attack while in Tulsa on that occasion? A. Oh—

"Q. Sometime that day, or anytime? A. Yes, his daughter, I believe, called the office.

"Q. Later in the day? A. That same day.

"Q. Same day? A. Yes, sir.

"Q. Now, did you ever make a visit up to the hospital to see him? A. Yes, sir, when I was permitted to see him.

"Q. Do you remember how long after the accident it was before you were able to see him? A. I would say approximately twenty or twenty-one days.

"Q. And you saw him in the hospital in Tulsa? A. Yes.

"Q. Do you remember which hospital? A. St. Johns, I believe.

"Q. Did you have occasion to talk with his doctor, while you were up there? A. Yes, sir, I talked to him.

"Q. Do you remember that doctor's name? A. No, sir, I don't.

"Q. Tell the Commission what, if anything, was said by you to him, respecting payment of his salary at the time you visited him in Tulsa? A. Well, I told Mr. Storm that he

didn't have a thing to worry about, as far as wages or his job or the operation of his job down at the Plant, that everything was taken care of and would be until he got back.

"Q. Until he got back, or better? A. Until he got back to work.

"Q. Got back to work? A. Yes sir."

Again the manager testified in answer to questions as follows:

"Now, after 1951, in September, 1951, after he returned to work, are you acquainted with the type of work you permitted him to do, up until the time you severed your connections with the company? A. Yes, sir.

"Q. Will you tell that to the Commission, please? A. He was in a supervision job only, no heavy work at all.

"Q. Will you tell the Commission, if you know, why you kept this man on and paid him his regular salary, when he was unable to do ordinary manual labor? A. Well, sir, I think that was entirely up to me, as Manager, and he performed well for me and he had been a long time employee, and I felt it was justified.

"Q. You knew then that no Form No. 3 or claim for compensation had ever been filed against the company? A. I never connected the two instances together in that sense of the word.

"Q. That is, the two instances, one the physical tramtic he suffered in April and the attack over in Tulsa? A. Yes, sir.

"Q. And so far as you know, up until the time you left the company, from the time of his injury in May, 1951, until you left the company, every weekly salary check thereafter was paid to him irrespective of the amount or nature of work he performed for the company? A. Yes, sir.

"Q. I don't believe you told exactly all the conversation that took place between you and the claimant in the hospital, or have you? With respect to this compensation and salary. A. Yes, sir. As far as I can remember that is *principly* the extent of it.

"Q. What, if anything, if you recall, was said about medical expense at the hospital? A. As far as I know, nothing was said, only that we both knew he was under this Insurance clause.

"Q. That's your Group Insurance? A. Group Insurance, yes, sir.

"Q. I take it, from what you said, Mr. Robertson, that you did not attach any significance to his heart attack, at the time he had it, and his priority to the right to claim compensation? A. No, sir, I never thought of it

"Q. You never thought of it? A. No, sir.

"Mr. Pierce: I believe that is all."

Again such manager testified on redirect examination in answer to questions, as follows, to-wit:

"Q. Mr. Bonds asked you, as I understood the question, that the accident was filed after the notice of such had been obtained from the claimant or from your own investigation. Now, is that right, it is either done after you have been advised or from your own investigation of the claim made by the claimant, is that right? A. Yes, sir.

"Q. And in this case, you attached no significance to it. I take it, that he didn't think the law even covered a heart attack. You knew about his heart attack? A. Sure.

"Q. He did? A. Yes, sir.

"Q. And you didn't make any advise whatever, to the Industrial Commission about it? A. No, sir.

"Q. And the reason for it, he didn't actually know the Law even covered it? A. No, sir.

Claimant himself, in answer to questions, testified as to this point as follows:

"Q. Will you tell the Commissioner, why you did not file claim for com-

pensation in this case before? A. Well—

"Q. In which a year has lapsed from the time you had your heart attack, in May, 1951? A. I figured it like this, the company had been good enough to me, and paid me right on through. And I figured there would be something or other in the company's orders that I could do, after we got somebody set up down there to carry on. Therefore, in my mind I figured well, why do you want to cause trouble in your own company? They have offered to do what they have done for you.

"Q. What had they offered to do? A. Well, they paid my salary right on through, you see, and therefore, told me to take this guy and break him in and not worry about the future, that they would figure out something for me, supervisor or something to that effect.

"Q. Were you advised by Mr. Robertson, or anyone else over you, that this company was covered by Industrial Insurance? A. No, not that I recall. * * *

"Q. Did you know at any time, before your discharge in November, 1952, that you were entitled to compensation under the law as your case arose while in the employ of the company, as a result of an accident? A. Well, on this heart attack, I didn't.

"Q. Sir? A. On this heart attack I had, I didn't.

"Q. You didn't? A. No.

"Q. You didn't know anything about it? A. No."

Claimant did admit signing employer's exhibits 1 and 2, being claims for hospitalization and surgical benefit made about the time of his hospitalization on two separate occasions as a result of the heart attack complained of in this action and a later occurrence thereof. To a question appearing in each of these exhibits, as follows: "Is the disability, either through sickness or accident, due in any way to a condition arising from the insured's or dependent's occupation?" claimant answered "No".

On re-direct examination, claimant testified that upon filling out the forms hereinabove next referred to, that he did not actually know that the heart attack was the result of pulling these trailers and on re-cross examination, admitted in answer to a question whether he knew that if he did not answer the question (on the hospital claim forms) in that way he could not get the hospital benefits, answered: "well, that was partly it, I guess."

One of employer's witnesses, the office manager, herself, admitted in answer to questions, as follows, to-wit:

"Q. Whose duties, Miss Patton, to file the necessary form with the State Industrial Commission when there is an accident report? A. Mine, with the authorization of the Manager.

"Q. The Manager, in this case at that time was, Mr. Robertson? A. Yes, sir.

"Q. And you had no authorization from him to file the necessary forms? A. No, sir.

"Q. Now, did you hear the testimony of the Manager this morning? A. Yes, sir.

"Q. Did you hear him say that he did not understand that a heart attack was a physical injury? A. Yes, sir, but he did.

"Q. Ma'am? Yes, sir, that he did understand it, that is fully explained to all of the employees by the manager, and I think you can verify it by the company people.

"Q. You say that you understood at that time, that a heart attack would be considered a physical injury? A. Yes, sir, if he was on the job.

"Q. If he was on the job? A. Which he was not."

It thus appears to have been conclusively shown by the claimant and without a word

of testimony to the contrary, that employer's Manager knew immediately thereafter that claimant, on May 15, 1951, sustained a heart attack while engaged in employer's work assigned claimant to do, visited him in the hospital and promised to see that his full wages were paid to him out of his hospitalization Insurance for the 13 weeks period by the hospital policy, to the extent of the first $35 thereof per week and that the additional $39 per week would be paid by the company for such period of 13 weeks and that thereafter the full $74 per week would be paid by the company and that such payments were made by the company for a number of weeks during which claimant remained in the hospital, at his daughter's home, and at his own home and was not at work, and that thereafter he continued to draw regular wages, even if working in a mere supervisory capacity rather than doing the heavy work of a mechanic as he had theretofore been required to do, and that the company went so far as to hire a physically able mechanic for 90 days and that some 30 days after the termination of the employment of the latter, employed a young man whom they had claimant to train as a mechanic and that with the exception of such 30 day period claimant did no heavy work and that during such 30 day period he had the assistance of a porter. I believe this testimony demonstrates conclusively that the order of the trial commissioner was, in the respect herein referred to, not supported by any testimony. The conclusion of the trial commissioner that "the failure to notify the respondent of the accidental injury precludes the respondent from making a choice between the payment of wages in lieu of compensation or leaving the claimant to his legal remedy" is without factual foundation.

In 85 O.S.1951 § 27, our legislature has said:

"Presumptions—In any proceeding for the enforcement of a claim for compensation under this act, it shall be presumed in the absence of sub-stantial evidence to the contrary * * * 1. That the claim comes within the provisions of this act. 2. That sufficient notice thereof was given. * * *"

In 85 O.S.1955 Supp. § 43, it was stated by our legislature:

"Claim for compensation barred after one year—Reopening case—Limitations.—The right to claim compensation under this Act shall be forever barred unless within one (1) year after the injury or death a claim for compensation thereunder shall be filed with the Commission. Provided, however, claims may be filed at any time within one (1) year from the date of last payment of any compensation or remuneration paid in lieu of compensation."

In the case of Logan County v. York, Okl., 270 P.2d 968, 969, this court said:

"Though the one-year statute of limitations, 85 O.S.1951 § 43, supra, provided in the Workmen's Compensation Act is somewhat peculiar in its wording, we have held that it is a true statute of limitations and can be tolled or can be waived. * * *

"The testimony is not positive that the salary was paid in lieu of compensation but from an examination of all the evidence we think the inference drawn from the positive testimony in the case by the Commission that the salary was so paid was a reasonable one. A reasonable inference drawn from positive testimony is evidence. * * *

"This is particularly true since we have held that the statute of limitations applicable here may be waived or tolled, we do not have a jurisdictional question and the evidence relating to the question of whether the statute was tolled or waived being on a non-jurisdictional question the finding of the Commission that the salary paid to claimant was paid in lieu of compensation will not be disturbed where, as above indicated, it is based on

testimony reasonably tending to show such fact, or reasonable inferences to that effect, reasonably inferable therefrom * * * and conversely, had the commission found that the evidence was insufficient to show that payment of wages was in lieu of compensation such order could have been sustained."

I believe the case should go back to the Industrial Commission for further hearing.

I therefore respectfully dissent.

I am authorized to state that Justice BLACKBIRD concurs in the views hereinabove expressed.